UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CANVS CORPORATION,

            Plaintiff,

v.                                 Case No:   2:14-cv-99-FtM-38MRM

NIVISYS, LLC,

            Defendant.

_____/

**ORDER[1]**

This matter comes before the Court on the Parties' Joint Claim Construction Pre-Hearing Statement (Doc. #57) filed on July 27, 2015; Plaintiff CANVS Corporation's Opening Claim Construction Brief (Doc. #39) filed on December 1, 2014; and Defendant Nivisys, LLC's Brief on Claim Construction (Doc. #46) filed on July 7, 2014.  A *Markman*[2] hearing was held on September 22, 2015 (Doc. #69).  The matter is ripe for review.

**Background**

This action arose from the alleged infringement of United States Patent No. 6,911,652 ("'652 Patent" or "Patent"), entitled "Low Light Imaging Device."  Stated in the simplest terms, the Patent describes a device that combines the benefits of night vision and thermal technology to create an enhanced image that gives the user a tactical

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or websites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites.  Likewise, the Court has no agreements with any of these third parties or their websites.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

[2] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 3780 (1996).

advantage in low light environments. '652 Patent. Nivisys manufactures and sells Thermal Acquisition Clip-on System ("TACS-M") products that, when attached to certain models of night vision devices, also create a device that combines night vision and thermal technology. (Doc. #1 at 3-4). CANVS believes these TACS-M products induce infringement and contribute to the direct infringement of several claims asserted in the Patent. (Doc. #1 at 5-7). Nivisys, however, believes there is a stark difference between the Patent and the device created from the attachment of its TACS-M products because the former performs image fusion, whereas the latter does not. (Doc. #11 at 4-7). The parties now ask the Court to construe six claim terms from the Patent that are in dispute.

### Standard

A "bedrock principle" of patent law is that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citations omitted). The Court must construe a claim "to accord [it] the meaning it would have to a person of ordinary skill in the art at the time of the invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). To do so, the Court first considers three sources of intrinsic evidence: the claims themselves, the specification, and the prosecution history (if it is in evidence). *Markman*, 52 F.3d at 979.

The claim language itself provides the starting point, "for that is the language the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Innova/Pure Water, Inc.*, 381 F.3d at 1116 (alterations and citations omitted). But this language must also "be read in view of the specification, of which [it is] a part." *Markman*, 52 F.3d at 979. The specification includes

a written description of the invention that "may act as a sort of dictionary, . . . explain[ing] the invention and . . . defin[ing] terms used in the claims." *Id.* And, if it is in evidence, the Court must also consider the patent's prosecution history. *See id* at 980. This "undisputed public record of proceedings in the Patent and Trademark Office is of primary significance in understanding the claims." *Id.* (citation omitted).

If necessary, the Court may also consider extrinsic evidence, consisting of "all evidence external to the patent and the prosecution history. . . ." *Id.* This includes "expert and inventor testimony, dictionaries, and learned treatises." *Id.* Such evidence "may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." *Id.* It may also "demonstrate the state of the prior art at the time of the invention," and be useful "to show what was then old, to distinguish what was new, and to aid the Court in the construction of the patent." *Id.* (citations omitted).

## Discussion

The Court will construe each disputed claim term in turn.[3]

2.  *"an optical input structured to define a line of sight"*

| No. | Term | CANVS' Proposed Alternative Construction | Nivisys' Proposed Construction |
|---|---|---|---|
| 2. | *"an optical input structured to define a line of sight"* | The entrance aperture(s) that determine(s) the line of sight between the low light imaging device and external objects. | A single optical input structured to define a single straight line of sight extending from the optical input to the scene being observed. |

---

[3] Although the parties ultimately agreed on many terms originally in dispute, the Court will use the original term numbers.

The parties' first dispute is over the term "an optical input structured to define a line of sight," found in Claims 4[4] and 5.  '652 Patent col. 7 ll. 19-22, 25.  CANVS believes no construction of this term is necessary, but proposes an alternative construction that provides, "[t]he entrance aperture(s) that determine(s) the line of sight between the low light imaging device and external objects."  (Doc. #39 at 9-14).  Nivisys proposes a construction that provides, "[a] single optical input structured to define a single straight line of sight extending from the optical input to the scene being observed."  (Doc. #46 at 4-9).  For the reasons set forth below, the Court finds a construction is necessary, but declines to adopt either proposed construction.

The Court agrees, for the most part, with CANVS' primary contention that no construction of this term is necessary.  That said, Nivisys makes one argument that the Court finds persuasive: this term must be construed to reflect *a single* line of sight.  Neither party contests that 'a' or 'an' typically "carries the meaning of 'one or more' in open-ended claim containing the traditional phrase 'comprising.'"  *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1350 (Fed. Cir. 2005).  There is an exception to this rule, however, "[w]hen the claim language and specification indicate that 'a' means one and only one."  *Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011).  Turning to this case, the Court finds both the rule and exception apply.

Both Claims 4 and 5 are open-ended claims containing "comprising."  This means any use of "a" or "an" in these claims typically means "one or more."  For "an optical input," this rule holds true.  Contrary to Nivisys' position, there is no explicit support in the specification or claim language to conclude the claims should be limited to a single optical

---

[4] Because Claim 4 is a dependent claim, each disputed term is read into Claim 4 through independent Claim 1.

input.   Rather, the specification provides it is "preferably a single optical input which defines a line of sight." '652 Patent col. 2 ll. 49-50.  The word "preferably" is not sufficient evidence to indicate that "a" means one and only one.   That said, the exception to the rule comes into play for "a line of sight."  The specification discusses "this line of sight," a singular description.  *Id.* at col. 2 l. 51.  The specification also teaches, and the claim language reflects, that the thermal imaging assembly and the image intensification assembly operate on the same line of sight to generate their respective images.  Again, a singular description for "a line of sight."  These clear indications that "a line of sight" means one and only one warrant applying the exception to the rule for this part of the term.

The Court therefore construes "an optical input structured to define a line of sight" as "an optical input structured to define a single line of sight."

*3.  "thermal image"*

| No. | Term | CANVS' Proposed Alternative Construction | Nivisys' Proposed Construction |
|---|---|---|---|
| 3. | "*thermal image*" | An image representative of the relative intensity of infrared radiation emitted by and/or reflected from objects in a scene. | An image that is a visible light representation of only thermal radiation signatures from a scene. |

The parties' second dispute is over the term "thermal image," found in Claims 4 and 5.   CANVS believes no construction of this term is necessary, but proposes an alternative construction that provides, "[a]n image representative of the relative intensity of infrared radiation emitted by and/or reflect from objects in a scene." (Doc. #39 at 14-15).  Nivisys proposes a construction that provides, "[a]n image that is a visible light

representation of only thermal radiation signatures from a scene."  (Doc. #46 at 10-15). For the reasons set forth below, the Court adopts Nivisys' proposed construction.

The specification teaches that "[t]he low light imaging device . . . includes a thermal imaging assembly."  '652 Patent col. 2 ll. 54-55.  This thermal imaging assembly is "structured to generate a thermal image that is representative of the perceived radiation signatures."  Id. at col. 2 ll. 57-58.  The low light imaging device also includes an image intensification assembly.  Id. at col. 2 ll. 61-62.  Similar to the thermal imaging assembly, this image intensification assembly "is structured to amplify the perceived photons in order to generate an enhanced photon based image that is viewable by the user of the device." Id. at col. 2-3 ll. 67-2.  Both the thermal imaging assembly and image intensification assembly have corresponding adjustment assemblies structured to adjust the intensity of their respective images.  Id. at col. 6 ll. 45-53, col. 8 ll. 33-38.  These images are eventually combined in the output image generation assembly, generating a single output image. Id. at col. 6 ll. 57-60, col. 8 ll. 1-4.[5]

Nivisys asserts its proposed construction is proper because it incorporates two important aspects into the "thermal image" term that are found throughout the specification and claims – (1) the thermal image contains only radiation signatures and no part of the enhanced photon based image and (2) the thermal image is a "visible light representation" because the term "image" is used throughout the Patent to refer to a user visible image.  For its part, CANVS argues that (1) a thermal image can include visual elements separate from the radiation signatures and still be a thermal image and (2) there is no reason the thermal image could not be in a non-visible portion of the light spectrum,

---

[5] Both Claims 4 and 5, the claims at issue, possess every limitation set out in this paragraph.

"as long as it was combinable to form a final visible image."  The Court will address each issue in turn.

As to the first issue, it is clear the thermal image and enhanced photon based image are separate and distinct images generated by separate and distinct image assemblies.  These separate and distinct images are not combined until they reach the output image generation assembly, and therefore cannot incorporate aspects of each other until that time.  Importantly, the initial use of the term "thermal image" in the claims refers to only the image generated by the thermal imaging assembly – an image that is "representative of [] radiation signatures."  *Id.* at col. 6 ll. 39-42, col. 7 ll. 26-29.  Any subsequent use of "thermal image" in the claims is prefaced with "said," rendering them anaphoric phrases that refer to the initial antecedent use of this term.  *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008).  Nivisys' proposed construction mirrors the claim language by describing the term as an image that only contains radiation signatures.  The Court therefore adopts this portion of Nivisys' proposed construction and finds CANVS' unsupported argument on this issue unpersuasive.

The second issue – whether "visible light representation" should be read into the term – is a closer call.  Nivisys asserts that "visible light representation" should be read into the construction to denote the thermal image is viewable to the user once it is generated by the thermal imaging assembly.  Nivisys bases this argument on the fact that all three image assemblies generate "images," and the enhanced photon based image and output image are viewable to the user once generated.  If "visible light representation" was excluded from the construction, then the word "image" would be used inconsistently

throughout the claim – two uses of "image" in the claim would refer to user-visible images, while the third would not.  CANVS disagrees and avers the construction should not include visible light representation because there are situations where the output from the thermal imager is not directly viewed, and thus could "be in a non-visible portion of the [light] spectrum as long as it was combinable to form a final visible image."

It is well established that "[a] word or phrase used consistently throughout a claim should be interpreted consistently." *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002) (citation omitted).  There is an exception to this rule, however, where the term is "used in two contexts with a subtle but significant difference." *Id.*  Then, the term "should not necessarily be interpreted to have the same meaning in both phrases." *Id.*  Turning to this case, the Court finds the rule, rather than the exception, applies.

The term image is used in the claims only three times – to describe (1) the thermal image from the thermal imaging assembly; (2) the enhanced photon based image from the image intensification assembly; and (3) the output image from the output image generation assembly.  It is undisputed that two of these images – the output image and enhanced photon based image – are viewable to the user once generated.  '652 Patent col. 3 ll. 4-6 ("The optical output is structured to provide the output image to be viewed by a user of the present invention in a readily viewable format."), col. 2-3 ll. 66-2 ("[T]he image intensification assembly is structured to amplify the perceived photons in order to generate an enhanced photon based image that is viewable by a user of the device."). The third image – the thermal image – is not explicitly described in the specification as being viewable once generated. But "image" is used consistently throughout the claim,

with no subtle differences.[6]  Interpreting the term "image" consistently therefore requires the Court to construe "thermal image" with some user-viewable aspect too.  Accordingly, the Court adopts "visible light representation" into the "thermal image" construction.

The Court therefore construes the term "thermal image" as "an image that is a visible light representation of only thermal radiation signatures from a scene."

### 4. "enhanced photon based image"

| No. | Term | CANVS' Proposed Alternative Construction | Nivisys' Proposed Construction |
|---|---|---|---|
| 4. | "enhanced photon based image" | A photon based image of the environment based upon amplification of the visible and near infrared light waves (i.e., photons) that increases the quantity of photons viewable by the user. | An image composed of intensified visible light of non-thermal photonic signatures directly from a scene and not including light from a previously generated image. |

The parties' third dispute is over the term "enhanced photon based image," found in Claims 4 and 5.  CANVS believes no construction of this term is necessary, but proposes an alternative construction that provides, "[a] photon based image of the environment based upon amplification of the visible and near infrared light waves (i.e., photons) that increases the quantity of photons viewable by the user."  (Doc. #39 at 15-17).  Nivisys proposes a construction that provides, "[a]n image composed of intensified visible light of non-thermal photonic signatures directly from a scene and not including light from a previously generated image."  (Doc. #46 at 10-15).  For the reasons set forth

---

[6] This is further confirmed by how the corresponding image adjustment assemblies operate.  The thermal imaging assembly has a corresponding thermal image adjustment assembly that "is structured to adjust an extent to which the thermal image defines the viewed output image."  '652 Patent col. 3 ll. 13-15.  Likewise, the image intensification assembly has a corresponding image adjustment assembly that "is structured to adjust an extent to which the enhanced photon based image defines the output."  '652 Patent col. 3 ll. 16-18.  Again, both thermal image and enhanced photon based image are used in the same context with no subtle differences.

below, the Court finds a modified version of CANVS' proposed construction is appropriate.

In its brief, CANVS points to several aspects of Nivisys' proposed construction that it believes would cause further confusion, such as "non-thermal photonic signatures," "directly from a scene," and "not including light from a previously generated image." Nivisys responded to this argument at the hearing by noting it was not advocating that the Court must adopt its construction exactly as proposed. Rather, it principally wanted to make sure the Court included two important aspects of this term found throughout the specification and claim language – 1) the enhanced photon based image is viewable by the user and 2) the thermal image and enhanced photon based image are separate and distinct images.  The Court has already noted the enhanced photon based image and thermal image are separate and distinct images, and incorporated this aspect into the previous term.  With that being the case, the Court finds good cause to incorporate this aspect into this term too.  The second aspect – viewable by the user – is already incorporated into CANVS' proposed construction.  It appears the best way to ensure both aspects are incorporated into the construction of this term – while avoiding any possible confusion that may arise with Nivisys' proposed construction – is to adopt CANVS' proposed construction and add the separate and distinct aspect into it.

The Court therefore construes "enhanced photon based image" as "[a] photon based image of the environment based upon amplification of the visible and near infrared light waves (i.e., photons) that increases the quantity of photons viewable by the user, which does not include any aspect of the thermal image."

*7(a). "an output image generation assembly structured to combine said thermal image and said enhanced photon based image to generate a real-time, direct view output image"*

| No. | Term | CANVS' Proposed Alternative Construction | Nivisys' Proposed Construction |
|---|---|---|---|
| 7(a). | "*an output image generation assembly structured to combine said thermal image and said enhanced photon based image to generate a real-time, direct view output image*" | An assembly which generates a [sic] image for viewing by a user that includes information from the thermal image that is optically combined with information from the enhanced photon-based image, and which is directly viewable by the user without significant delay between the actual event and the view provided to the user. | An output image generation assembly structured to optically combine two already-formed separate and distinct thermal and enhanced photon based images to create at [sic] third image that is a combined image composed of the thermal image and the enhanced photon based image. |

The parties' fourth dispute is over the term "an output image generation assembly structured to combine said thermal image and said enhanced photon based image to generate a real-time, direct view output image," found in Claim 4.  CANVS believes no construction of this term is necessary, but proposes an alternative construction that provides, "[a]n assembly which generates a [sic] image for viewing by a user that includes information from the thermal image that is optically combined with information from the enhanced photon-based image, and which is directly viewable by the user without significant delay between the actual event and the view provided to the user." (Doc. #39 at 19-20).   Nivisys proposes a construction that provides, "[a]n output image generation assembly structured to optically combine two already-formed separate and distinct thermal and enhanced photon based images to create at [sic] third image that is a combined image composed of the thermal image and the enhanced photon based

image."[7]  (Doc. #46 at 15-23).  For the reasons set forth below, the Court finds a modified version of Nivisys' proposed construction is appropriate.

The principal differences between the parties' proposed constructions are whether the thermal image and enhanced photon based image are created separately and whether the output image generation assembly combines those images or just information from them.  Nivisys asserts that "the entire structure of the claim clearly requires the combination of already-formed images."  CANVS, however, contends that the output image generation assembly "is not restricted to combining before after or during formation of either image so long as it generates a single output image of both thermal and intensified.  The combined image can be generated within the thermal imager or within the image intensifier as long as it includes relative amount of both images."  The Court agrees with Nivisys.

The Court has already detailed how the thermal imaging assembly and image intensification assembly work to generate two separate and distinct images – the thermal image and the enhanced photon based image, respectively.  While CANVS avers these images can combine and use "information" from one another before reaching the output image generation assembly, the specification and claims provide otherwise.  The claim language provides that a thermal imaging assembly is structured to generate a thermal image and an image intensification assembly is structured to generate an enhanced photon based image.  '652 Patent col. 6 ll. 39-44.   The output image generation assembly is "structured to *combine said thermal image* and *said enhanced photon based image* to

---

[7] At the *Markman* hearing, Nivisys averred that "via image fusion" and "only" should not have been included in its proposed construction.  CANVS had no objection to the removal of these phrases.  The Court therefore considers Nivisys' proposed construction without the phrases "via image fusion" and "only" included, as presented at the hearing.

generate a real-time, direct view output image." *Id*. at col. 6 ll. 57-60 (emphasis added). There is no mention or indication that the output image generation assembly uses "information" from the thermal image or enhanced photon based image to create the output image. Nor is there any indication or mention that these images combine at any time prior to reaching the output image generation assembly. The language is clear – the thermal image and enhanced photon based image are created by their respective assemblies, and it is not until they reach the output image generation assembly that these two already-formed, separate images are combined to form the output image.[8]

The Court therefore construes "an output image generation assembly structured to combine said thermal image and said enhanced photon based image to generate a real-time, direct view output image" as "[a]n output image generation assembly structured to optically combine an existing, separate and distinct thermal image and an existing, separate and distinct enhanced photon based image to create a third image that is a combined image composed of the thermal image and the enhanced photon based image."

---

[8] At the *Markman* hearing, CANVS averred that adopting Nivisys' proposed construction would render this claim a method claim even though there is no basis for doing so. The Court disagrees. Indeed, there is no temporal limitation as to whether the thermal image or enhanced photon based image, if any, is formed first. Nor is there such a limitation as to which one of these images, if any, reaches the output image generation assembly first. But it is clear these images must be formed before the output image generation assembly generates the output image. Otherwise, without the "said thermal image" or "said enhanced photon based image," there would be nothing for the output image generation assembly to combine to generate the output image.

*7(b). "an output image generation assembly structured to combine said thermal image and said enhanced photon based image to generate a single output image"*

| No. | Term | CANVS' Proposed Alternative Construction | Nivisys' Proposed Construction |
|---|---|---|---|
| 7(b). | "*an output image generation assembly structured to combine said thermal image and said enhanced photon based image to generate a single output image*" | An assembly which generates a single output image, that includes information from the thermal image that is optically combined with information from the enhanced photon-based image. | An output image generation assembly structured to optically combine two already-formed separate and distinct thermal and enhanced photon based images to create at [sic] third image that is a combined image composed of the thermal image and the enhanced photon based image. |

The parties' fifth dispute is over the term "an output image generation assembly structured to combine said thermal image and said enhanced photon based image to generate a single output image," found in Claim 5.  CANVS believes no construction of this term is necessary, but proposes an alternative construction that provides, "[a]n assembly which generates a single output image, that includes information from the thermal image that is optically combined with information from the enhanced photon-based image."  (Doc. #39 at 19-20).  Nivisys once again proposes a construction that provides, "[a]n output image generation assembly structured to optically combine two already-formed separate and distinct thermal and enhanced photon based images to create at [sic] third image that is a combined image composed of the thermal image and the enhanced photon based image."  (Doc. #46 at 15-23).

Even though this term is from a different claim, the parties present the same arguments for this term as they did for the last term. The Court's analysis on these arguments remains the same.  That said, the Court construes "an output image

generation assembly structured to combine said thermal image and said enhanced photon based image to generate a single output image" as "[a]n output image generation assembly structured to optically combine an existing, separate and distinct thermal image and an existing, separate and distinct enhanced photon based image to create a third image that is a combined image composed of the thermal image and the enhanced photon based image."

8. *"a first image adjustment assembly and a second image adjustment assembly, said first and second image adjustment assemblies being operable to adjust said first and second imaging assemblies so as to adjust an intensity of said thermal image and said enhanced photon based image generated thereby"*

| No. | Term | CANVS' Proposed Alternative Construction | Nivisys' Proposed Construction |
|---|---|---|---|
| 8. | "*a first image adjustment assembly and a second image adjustment assembly, said first and second image adjustment assemblies being operable to adjust said first and second imaging assemblies so as to adjust an intensity of said thermal image and said enhanced photon based image generated thereby*" | First and second controls which are each capable of automatic or manual adjustment of an aspect of an image, the first control is structured to adjust the quantity of the thermal image as a portion of the output image and the second control is structured to adjust the quantity of the photon based image as a portion of the output image. | Two manually adjustable image adjustment assemblies that operate to adjust an intensity of the thermal and enhanced photon based images to control, from 0% to 100%, the amount of each of the thermal and enhanced photon based images in a direct-view fused image composed of a direct view of the thermal image and a direct view of the enhanced photon based image.<br><br>*Alternative Construction:*<br><br>First and second controls which are each capable of ~~automatic or~~ manual adjustment of an aspect of an image, the first control is structured to adjust only the quantity of the thermal image as a portion of the output image and the |

| | | | second control is structured to adjust only the quantity of the photon based image as a portion of the output image. |
|---|---|---|---|
| | | | |

The parties' final dispute is over the term "a first image adjustment assembly and a second image adjustment assembly, said first and second image adjustment assemblies being operable to adjust said first and second imaging assemblies so as to adjust an intensity of said thermal image and said enhanced photon based image generated thereby," found in Claim 5.  CANVS believes no construction of this term is necessary, but proposes an alternative construction that provides, "first and second controls which are each capable of automatic or manual adjustment of an image, the first control is structured to adjust the quantity of the thermal image as a portion of the output image and the second control is structured to adjust the quantity of the photon based image as a portion of the output image."  (Doc. #39 at 20-21).  In its brief and at the *Markman* hearing, Nivisys agreed to CANVS' proposed alternative construction, provided the Court makes two changes.  (Doc. #46 at 24-30).

First, Nivisys asks the Court to place "only" before both "the quantity of the thermal image" and "the quantity of the photon based image" to reflect that the controls operate separately and independently from one another.  Second, Nivisys asks the Court to remove "automatic" from the construction, as the specification teaches the controls are manually, not automatically, adjusted by the user.  CANVS did not present an argument supporting its proposed construction in its brief.  But at the hearing, CANVS took issue with these requests.  CANVS averred there is nothing in the Patent requiring the controls

to be manually operated.  Rather, CANVS likened the controls to an auto white balance on a camera, where the user pushes a button, but the white balance function is still automatically completed.  CANVS also took issue with placing "only" in the two locations specified, contending this placement would cause confusion.  The Court finds a modified version of CANVS' proposed construction is appropriate.

CANVS conceded at the hearing that the prosecution history shows it distinguished prior art by pointing out its first and second image adjustment assemblies are separately and independently controlled, and thus it is bound to this limitation. (Doc. #46-8 at 9-10; Doc. #46-5 at 3-4; Doc. #46-6 at 3-4).  With that being the case, the Court agrees with Nivisys that separately and independently should be incorporated into CANVS' proposed construction.  See *Fenner Investments, Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) (explaining that the prosecution history assists in "captur[ing] the scope of the actual invention that is disclosed, described, and patented").  To qualm CANVS' concerns that incorporating this limitation into the construction by using "only" would cause confusion, the Court will instead use "separately and independently" in the locations where Nivisys requested "only" be inserted.

Moving onto the next issue, the Court sees no reason to incorporate "automatic" or "manual" into the construction.  While CANVS attempts to analogize the image adjustment assemblies to other automated devices or functions, there is not substantial support in the Patent for this position.  Nor is there substantial support to conclude the image adjustment assemblies are only manually operated, as Nivisys proposes.  The specification teaches only that these image adjustment assemblies "allow the user to modify the output image to correspond the [sic] needs of a particular tactical

environment." '652 Patent col. 3 ll. 9-11.  This language fails to illustrate the manner in which the modification/adjustment is accomplished.   Without substantial support for either position, reading these terms into the construction would be improper.

The Court therefore construes "a first image adjustment assembly and a second image adjustment assembly, said first and second image adjustment assemblies being operable to adjust said first and second imaging assemblies so as to adjust an intensity of said thermal image and said enhanced photon based image generated thereby" as "first and second controls which are each capable of adjusting an aspect of an image, the first control is structured to separately and independently adjust the quantity of the thermal image as a portion of the output image and the second control is structured to separately and independently adjust the quantity of the photon based image as a portion of the output image."

Accordingly, it is now

**ORDERED:**

The disputed language from Claims 4 and 5 shall be constructed as follows:

| Term No.: | Term: | Court's Construction: |
|---|---|---|
| 2. | "an optical input structured to define a line of sight" | "an optical input structured to define a single line of sight" |
| 3. | "thermal image" | "an image that is a visible light representation of only thermal radiation signatures from a scene" |
| 4. | "enhanced photon based image" | "a photon based image of the environment based upon amplification of the visible and near infrared light waves (i.e., photons) that increases the quantity of photons viewable by the user, which does not include any aspect of the thermal image" |
| 7(a). | "an output image generation assembly structured to | "an output image generation assembly structured to optically combine an |

|  | "combine said thermal image and said enhanced photon based image to generate a real-time, direct view output image" | existing, separate and distinct thermal image and an existing, separate and distinct enhanced photon based image to create a third image that is a combined image composed of the thermal image and the enhanced photon based image" |
|---|---|---|
| 7(b). | "an output image generation assembly structured to combine said thermal image and said enhanced photon based image to generate a single output image" | "an output image generation assembly structured to optically combine an existing, separate and distinct thermal image and an existing, separate and distinct enhanced photon based image to create a third image that is a combined image composed of the thermal image and the enhanced photon based image" |
| 8. | "a first image adjustment assembly and a second image adjustment assembly, said first and second image adjustment assemblies being operable to adjust said first and second imaging assemblies so as to adjust an intensity of said thermal image and said enhanced photon based image generated thereby" | "first and second controls which are each capable of adjusting an aspect of an image, the first control is structured to separately and independently adjust the quantity of the thermal image as a portion of the output image and the second control is structured to separately and independently adjust the quantity of the photon based image as a portion of the output image" |

**DONE** and **ORDERED** in Fort Myers, Florida, this 28th day of October, 2015.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record